# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NANCY LEGG, Individually and as Administratrix of the Estate of Jeffrey Max Legg,<br><br>         Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA,<br><br>         Defendant. | Civil Action No. 3:14-CV-838 (DEP) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE*

Date: May 16, 2016

RICHARD S. HARTUNIAN
United States Attorney
Northern District of New York
100 South Clinton Street
Syracuse, New York 13261

By: *Michael D. Gadarian*
*Assistant United States Attorney*
*Bar Roll No. 517198*

*William F. Larkin*
*Assistant United States Attorney*
*Bar Roll No. 102013*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... i

I. INTRODUCTION ............................................................................................................... 1

II. BACKGROUND ................................................................................................................. 1

III. ARGUMENT ...................................................................................................................... 7

    A.  This Court Lacks Jurisdiction Over Unexhausted and Un-pleaded Claims ................ 7

    B.  Only Evidence Relevant to Plaintiff's Exhausted, Pleaded Claim is Admissible ..... 13

IV. CONCLUSION ................................................................................................................ 16

# TABLE OF AUTHORITIES

**Case Law**

*Adams by Adams v. United States Dep't of Housing and Urban Dev.*,
   807 F.2d 318 (2d Cir. 1986) ..................................................................................... 8

*In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 210 (2d Cir. 1987) ............................... 8

*Barnes v. United States*, 137 Fed. App'x 184 (10th Cir. 2005) ...................................... 9

*Bethel v. United States ex rel. Veterans Admin. Med. Ctr. of Denver, Colo.*,
   495 F. Supp. 2d 1121 (D. Colo. 2007) ............................................................... 9, 10

*Bumgardner v. United States*, 469 Fed. App'x 414 (6th Cir. 2012) ............................. 14

*Dundon v. United States*, 559 F. Supp. 469 (E.D.N.Y. 1983) ...................................... 11

*Franz v. United States*, 414 F. Supp. 57 (D. Ariz. 1976) ............................................. 10

*Johnson v. Smithsonian Inst.*, 189 F.2d 180 (2d Cir. 1999) ........................................... 9

*Johnson by Johnson v. United States*, 788 F.2d 845 (2d Cir. 1986) ..................... 8, 10-12

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1977) ............................................ 8

*Kraut v. United States*, No. 86 C 1346, 1989 WL 29985 (E.D.N.Y. Mar. 22, 1989) ... 12

*Laskowski v. United States Dep't of Veterans Affairs*, 918 F. Supp. 2d 301 (M.D. Pa. 2013) ........... 15

*Lehman v. Nakshian*, 453 U.S. 156 (1981) ............................................................. 7, 12

*Lewis v. United States*, No. 05-1676, 2008 WL 3927279 (D.S.C. Aug. 21, 2008) ...... 14

*Linardos v. Fortuna*, 157 F.3d 945 (2d Cir. 1998) ........................................................ 8

*Liranzo v. United States*, 690 F.3d 78 (2d Cir. 2012) ................................................. 15

*M.A.R. ex rel. Reisz v. United States*, No. 09-cv-1727, 2009 WL 3877872
   (S.D.N.Y. Nov. 18, 2009) ...................................................................................... 9

*McNeil v. United States*, 113 S.Ct. 1980 (1993) ........................................................... 8

*McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178 (1935) ................................... 8

*Romulus v. United States*, 160 F.3d 131 (2d Cir. 1998) ................................................................ 8

*Scelsa v. City Univ. of N.Y.*, 76 F.3d 37 (2d Cir. 1996) ................................................................ 8

*Schunk v. United States*, 783 F. Supp. 72 (E.D.N.Y. 1992) ....................................................... 12

*Soriano v. United States*, 352 U.S. 270 (1957) ............................................................................ 7

*Soriano v. United States*, No. 12-cv-4752, 2013 WL 3316132 (S.D.N.Y. July 1, 2013) .................. 10

*Staggs v. United States ex rel. Dep't of Health and Human Servs.*, 425 F.3d 881 (10th Cir. 2005) . 10

*Yeboah v. United States*, No. 99-cv-4923, 2000 WL 1876638 (S.D.N.Y. Dec. 26, 2000) .......... 13, 14

*United States v. Testan*, 424 U.S. 392 (1976) .............................................................................. 7

### Statutes

28 C.F.R. § 14.2(a) .................................................................................................................. 8, 11

28 U.S.C. § 1346(b) ("FTCA") .......................................................................................... 1, 8, 13, 15

28 U.S.C. § 2401 ......................................................................................................................... 13

28 U.S.C. § 2675 ........................................................................................................................... 8

28 U.S.C. § 2680 ......................................................................................................................... 15

Fed. R. Evid. 401 .................................................................................................................... 13, 15

Fed. R. Evid. 402 .................................................................................................................... 13, 15

Fed. R. Evid. 403 .................................................................................................................... 13-15

## I. INTRODUCTION

Plaintiff filed this Federal Tort Claims Act ("FTCA") case against the United States alleging medical malpractice leading to the wrongful death of Jeffrey Max Legg. The United States moves *in limine* to limit the evidence at trial to that relevant to whether Dr. Kim N.S. Duque deviated from the standard of care on December 28, 2011 during Mr. Legg's outpatient mental health visit at the Syracuse Veterans Administration Medical Center ("Syracuse VAMC"). Evidence regarding other alleged deviations from the standard of care should be excluded because this Court lacks jurisdiction over such claims and they were not pleaded in the Complaint. This motion is necessary because Plaintiff's expert reports evince Plaintiff's intent to introduce irrelevant evidence relating to jurisdictionally barred claims.

## II. BACKGROUND

In December 2013, Plaintiff filed an Administrative Claim (SF-95) with the VA. Ex. A. The Administrative Claim included an 8-page letter from Plaintiff's counsel setting forth the "Statement of Claim." In pertinent part, it described Plaintiff's claim as follows:[1]

> In Mr. Legg's case, the standards of practice relate to psychiatric care. Plaintiff's expert psychiatrist will testify that Dr. Duque deviated from the standard of care for psychiatrists in numerous ways, including the act of providing a large supply of Zolpidem [Ambien] to someone with diagnoses of PTSD [Post-traumatic stress disorder] and MDD [Major depressive disorder], and a previously-documented suicide attempt. At the time he was given the prescription, Mr. Legg stated he had lost 15 pounds unintentionally and could not sleep, both major signs of depression. He had a history of substance abuse, with both alcohol and marijuana, and had attempted suicide just one year prior to his visit with Dr. Duque. All of these conditions were documented in VA records, and many were stated by the decedent to Dr. Duque on December 28, 2011. These records were either not reviewed or

---

[1] The government denies that Dr. Duque deviated from the standard of care and believes Plaintiff will fail at trial to meet her burden to establish otherwise. Further, several of the "facts" in the Statement of Claim contained with the SF-95 are false.

> not given appropriate weight when the prescription was provided to Mr. Legg.
>
> According to the autopsy report, the cause of death was likely mixed drug toxicity with Zolpidem, Ethanol, and Dextro/Levo Methorophan; other drugs prescribed by the VA were also in Mr. Legg's system. His death by an overdose was the natural and probable consequence of providing quantity of Zolpidem to Mr. Legg in conjunction with access to other medications he had, and given his symptoms and mental health history.
>
> In addition, Dr. Duque failed to take basic steps to protect Mr. Legg's health on December 28, 2011. For example, Dr. Duque failed to recognize the gravity of Mr. Legg's overall condition, despite the clear warning signs from his presentation and his chart. She did not discuss his situation with his wife or family, who were present at the time. She did not suggest or consider that Mr. Legg should be admitted to the hospital for observation, or scheduled for follow-up consultations prior to his next appointment with Dr. Kaul the following week. Furthermore, Dr. Duque, as a Resident, did not consult with a supervising physician about her observations of and treatment plan for Mr. Legg. Dr. Fayer is prepared to testify that these lapses on the part of Dr. Duque and the VA constituted malpractice and were proximate causes of Mr. Legg's death.
>
> Mr. Legg's wife, Nancy, is the legal representative of his estate and his sole distributee. Mr. Legg died as a result of the VA's negligence in prescribing a large quantity of Zolpidem as a sleep aid when other, less harmful medications such as Doxepin were available instead. Mrs. Legg suffered a loss of income due to Mr. Legg's death that was more than half of the household income.

Ex. B at 6-7.

Plaintiff's SF-95 included a declaration from Dr. Fayer dated December 20, 2013, who is also one of Plaintiff's designated experts. Ex C. In his declaration, Dr. Fayer asserted that "the VAMC substantially deviated from the standard of care for a patient diagnosed with PTSD and MDD by not speaking with Mr. Legg's wife to obtain necessary information regarding his treatment during his visit on December 28, 2011, by prescribing 30-days of Zolpidem to a patient Dr. Duque had not seen prior, and by not having a senior doctor review resident Duque's

2

treatment notes and the prescription issued on December 28, 2011."[2] *Id.* Dr. Fayer's declaration does not say that the VA deviated from the standard of care in connection with any other aspect of Mr. Legg's care and treatment. This was the case even though Dr. Fayer had "reviewed the medical records of Mr. Jeffrey M. Legg, decedent, of the medical treatment he received at the Syracuse VAMC" and summarized Mr. Legg's medical history as reflected in those records. Ex. C.

Plaintiff filed her Complaint in this Court on July 11, 2014. Consistent with the SF-95, Plaintiff alleged malpractice only in connection with Mr. Legg's December 28, 2011 visit with Dr. Duque. Specifically, Plaintiff alleged:

> ➤ Upon information and belief, Dr. Duque did not thoroughly review Mr. Legg's medical chart or medical history before prescribing him Zolpidem.
>
> ➤ Upon information and belief, Dr. Duque did not obtain the oversight and review of her prescription and plan of treatment for Mr. Legg by a more senior psychiatrist.
>
> ➤ The drug Zolpidem should not have been prescribed to Mr. Legg given his history of major depression disorder, a suicide attempt and substance abuse problems. In addition, prescription of a thirty-day supply of the drug was absolutely unwarranted due to Mr. Legg's impending appointment on January 4, 2012.
>
> ➤ Under basic standards of psychiatric care, Dr. Duque should have deferred the decision to prescribe a major sedative to Mr. Legg to Dr. Prashant Kaul with whom Mr. Legg had an appointment scheduled on January 4, 2012.
>
> ➤ Under basic standards of care for patients diagnosed with PTSD and MDD, Dr. Duque should have spoken to Mr. Legg's wife to obtain necessary information regarding his treatment during the December 28, 2011 visit.
>
> ➤ Under basic standards of psychiatric care, Dr. Duque failed to recognize the gravity of Mr. Legg's overall condition, despite the clear warning signs from his presentation and his chart. For example, she did not suggest or consider that Mr. Legg should be admitted to the hospital for observation, or scheduled for follow-up consultations prior to his next appointment with Dr. Kaul the following week. Nor did she, as a Resident, consult with a supervising physician about her observations of and treatment plan for Mr. Legg.

---

[2] Dr. Duque was not a resident but, rather, was an attending psychiatrist.

- Under all the above circumstances the Defendant departed from the standard of care for a patient diagnosed with PTSD, MDD and substance abuse, and who had a suicide attempt one year earlier.

Cmpl. (dkt 1) ¶¶ 33-39.

Further, in responding to interrogatories in January 2015 Plaintiff remained consistent in focusing on the December 28, 2011 visit. For example:

- State and describe in full and complete detail the basis for your allegations in paragraph 39 of the Complaint that the defendant departed from the standard of care for a patient diagnosed with PTSD, MDD, and substance abuse, who had a suicide attempt one year earlier.

    o Plaintiff objects to the interrogatory to the extent that it calls for legal opinion. Notwithstanding said objection, Plaintiff relies on the November 15, 2013 Declaration of Steven A. Fayer, M.D. and reserves the right to supplement this response in conjunction with expert disclosure.[3]

- State in full and complete detail all injuries, illnesses or disabilities claimed to have been received or suffered by plaintiff's decedent as a result of the incidents alleged in the Complaint and state when such injuries, illnesses or disabilities first manifested themselves.

    o Plaintiff objects to the interrogatory to the extent that it is over-broad and unduly burdensome. Without waiving said objection and subject to it, Plaintiff states that subsequent to his visit with Dr. Duque, Plaintiff's decedent husband was depressed and experienced other physical and mental conditions as set forth in response to interrogatory 13, and died on January 3, 2012.[4]

- Identify in detail the specific damages plaintiff's decedent sustained as a result of the allegations contained in the Complaint, including but not limited to, an itemized list of any claim for monetary damages.

    o Plaintiff's decedent suffered conscious pain and suffering from December 28, 2011 to this death on January 3, 2012 in the amount of $1,238,815. Plaintiff on behalf of plaintiff's decedent also claims funeral expenses of $11,185.

---

[3] The November 15, 2013 Declaration, attached as Exhibit D, was even more circumscribed than the Declaration of Dr. Fayer that was included with the SF-95. Neither includes any claim that the VA providers were negligent in their care and treatment of Mr. Legg other than on December 28, 2011.

[4] Plaintiff's response to interrogatory 13 described events after the December 28, 2011 appointment.

4

Ex. E (Int. 11, 15, 17).

Plaintiff has never sought to amend her SF-95 or her Complaint and could not do so now because any alleged malpractice other than the claim in the SF-95 and Complaint is time-barred. Nevertheless, Plaintiff's expert reports reflect that Plaintiff intends to introduce evidence of alleged malpractice concerning the care and treatment that Mr. Legg received by various providers at the VA in the year leading up to Mr. Legg's December 28, 2011 visit. Specifically, Dr. Fayer's declaration in the SF-95 was four double spaced pages with an opinion regarding an alleged deviation from the standard of care focused exclusively on Mr. Legg's December 28, 2011 appointment. In July 2015 (approximately a year and half after that declaration), he wrote a 19-page single spaced expert report that added the following assertions of malpractice by a host of VA providers in the twelve months before the December 28, 2011 visit.[5] Ex. F.

- "First Clinical Comment – Initial Treatment" (Ex. F at 4)

    - "The failure to establish a treatment plan [in December 2010] that included weekly psychotherapy along with medication management was a deviation and departure from the acceptable standard of care in this situation."

    - "It was a departure from the standard of care to fail to include Mrs. Legg as part of Mr. Legg's treatment plan given the fact that he had an aborted suicide attempt."

- "Second Clinical Comment – Treatment from February to June 2011" (Ex. F at 7-9)

    - "It was a deviation and departure from the acceptable standard of care for VA providers, including Dr. Gay, to fail to start Mr. Legg with a psychotherapist prior to April 2011 – more than four months after his attempted suicide."

    - "It was a deviation and departure from the acceptable standard of care for [Mr. Moss] to take Mr. Legg's statements about 'cutting back to three beers in three months' at face value given Mr. Legg's heavy past drinking and his current diagnoses of PTSD and MDD."

---

[5] The government denies that any of the providers at the VA deviated from the standard of care.

- o "It was a deviation and departure from the acceptable standard of care for Dr. Gay and Mr. Moss to fail to discuss and address Mr. Legg's heavy marijuana use, which is a substance use problem."

- o "It was a deviation and departure from the acceptable standard of care for Dr. Gay and Mr. Moss to fail to ever communicate about their patient."

- o "It was a departure from the standard of care to fail to include Mrs. Legg as part of Mr. Legg's treatment plan given his unstable condition and severe symptoms of PTSD and MDD."

➢ "Third Clinical Comment – Treatment from July to November 2011" (Ex. F at 11-14)

- o "It was a deviation and departure from the acceptable standard of care for Mr. Legg to have gone without a psychiatrist for three months following Dr. Gay's departure."

- o "It was a deviation and departure from the standard of care for psychotherapy appointments to be scheduled three weeks apart (July 20 to August 10) given Mr. Legg's more depressed mood, chronic PTSD, concerns with losing his psychiatrist, and relatively recent suicide attempt."

- o "It was a deviation and departure from the standard of care for Mr. Moss to fail to investigate the status of Mr. Legg's depression further and assist him in addressing the depression more aggressively by facilitating an appointment between Mr. Legg and a psychiatrist for review of his medication regime."

- o "[I]t was a deviation and departure from the standard of care to neglect any and all of [more frequent therapy appointments, outpatient substance use treatment, a discussion about complying with prescribed medication regimes, and more frequent check-ins with a psychiatrist]."

- o "It was a further deviation to have Mr. Legg wait 20 more days – nearly three weeks – for his next appointment with either a psychiatrist or therapist."

- o "It was a deviation and departure from the standard of care for Dr. Kaul, at his first visit with Mr. Legg on October 4, 2011, to take a face value Mr. Legg's statement that he did not use alcohol at all, particularly given the fact that Mr. Legg stated he used marijuana *every* night to get to sleep and smoked 3-4 cigarettes per day – both indicating a substance use problem."

- o "Dr. Kaul also did not screen for substance use, depression, suicide risk, or PTSD at his initial visit with this new patient, an additional departure from the standard of care."

6

- o "It was also a separate and significant deviation and departure from the acceptable standard of care for the VA providers not to have coordinated their care of Mr. Legg, or communicated with each other about their care of Mr. Legg."

- o "[I]t was a substantial deviation from the standard of care for Mr. Moss, or anyone else at the VA, not to have followed up with Mr. Legg after his missed appointment in late October and subsequent failure to schedule another appointment."

- o "The ongoing failure of Mr. Legg's treatment providers at the VA to address his substance abuse problems is another substantial deviation from the standard of care."

Plaintiff's other psychiatric expert, Dr. Goldstein, submitted a 35-page expert report that includes four "clinical comments," only one of which addresses the alleged negligence of Dr. Duque on December 28, 2011. Ex. G. Much of that expert report also relies upon internal VA Guidelines for the long-term management and treatment of PTSD and MDD, which have little if any relevance to the standard of care applicable to Dr. Duque on December 28, 2011. In addition, Plaintiff also deposed (and may seek to call) a number of fact witness without any knowledge that could be relevant to whether Dr. Duque deviated from the standard of care on December 28, 2011.

## III.   ARGUMENT

### A. This Court Lacks Jurisdiction Over Unexhausted and Un-pleaded Claims

"The United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued . . . define th[e] court's jurisdiction to entertain the suit." *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)). When the United States waives its immunity from suit, "limitations and conditions upon which the Government consents to be sued must be strictly observed, and exceptions thereto are not to be implied." *Lehman*, 453 U.S. at 161 (quoting *Soriano v. United States*, 352 U.S. 270, 276 (1957)).

7

A suit under the FTCA must comply with the FTCA's conditions of the waiver of sovereign immunity. *See Adams by Adams v. United States Dep't of Housing and Urban Dev.*, 807 F.2d 318, 321 (2d Cir. 1986) (requirements of 28 U.S.C. § 2675 are jurisdictional in nature and cannot be waived). It is Plaintiff's burden "to both plead and prove compliance with the statutory requirements." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 210, 214 (2d Cir. 1987) (internal citations omitted). In the absence of compliance, a district court has no subject matter jurisdiction. *Id.*; *see also Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1977) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182 (1935)); *Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998); *Scelsa v. City Univ. of N.Y.*, 76 F.3d 37, 40 (2d Cir. 1996).

One of the FTCA's conditions of waiving sovereign immunity is that a party must first present an administrative claim to the relevant agency and have that claim denied. 28 U.S.C. § 2675(a); *McNeil v. United States*, 113 S. Ct. 1980, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."). Although § 2675 does not require a formal legal pleading, it does require "the basic elements of notice of accident and injury in a sum certain representing damages" so that an agency may investigate the claim. *Johnson by Johnson v. United States*, 788 F.2d 845, 849 (2d Cir. 1986) (internal citations omitted) (reversed on other grounds); *Romulus v. United States*, 160 F.3d 131, 132 (2d Cir. 1998) (an administrative claim filed pursuant to the FTCA "must provide enough information to permit the agency to conduct an investigation and to estimate the claim's worth" and the "mere act of filing a [Notice of Claim] does not necessarily fulfill the presentment requirement of § 2675(a)."); 28 C.F.R. § 14.2(a) ("[A] claim shall be deemed to have been presented when a Federal agency receives from a claimant, his duly authorized agent or legal representative, an executed Standard Form 95 or other written notification of an incident,

8

accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident."). The presentation requirement is strictly construed, and ambiguities must be resolved in favor of the government. *Johnson v. Smithsonian Inst.*, 189 F.2d 180, 189 (2d Cir. 1999).

Here, Plaintiff failed to exhaust any malpractice claim arising out of Mr. Legg's care and treatment at the VA other than with respect to the care and treatment of Dr. Duque on November 28, 2011 (thereby depriving this Court of jurisdiction over any such claims).[6] Thus, this Court lacks jurisdiction over any other malpractice claim. *See M.A.R. ex rel. Reisz v. United States*, No. 09-cv-1727, 2009 WL 3877872 at *4 (S.D.N.Y. Nov. 18, 2009) ("The Administrative Claim was replete with allegations of various omissions by ODA and Dr. Wind during prenatal care, delivery and neonatal care, and was therefore adequate to prompt an investigation into the treatment decisions made by the relevant personnel and their consequences for M.A.R. However, the Administrative Claim provided no notice that Reisz believed M.A.R. was injured by a procedure that was performed or a treatment that was given that Reisz would have refused had she been adequately informed . . . . The Administrative Claim was therefore inadequate to provide notice to the Government that it had to investigate what information was given to Reisz and whether she either provided her informed consent to the procedures that were performed or whether, under the circumstances, her informed consent was not required."); *Barnes v. United States*, 137 Fed. App'x 184, 188 (10th Cir. 2005) ("Mr. Barnes's administrative complaint provided notice of his complaint only insofar as it arose from the events of January 26 to January 28, 1999. With respect to claims arising from treatment on other dates, Mr. Barnes failed to

---

[6] The government did not move for summary judgment on Plaintiff's unexhausted and un-pleaded "claims" because there was nothing in the Complaint to seek judgment on. Thus, the proper vehicle to address the issue of Plaintiff's irrelevant (and jurisdictionally barred) evidence is this motion *in limine*.

9

exhaust his administrative remedies, and the district court properly granted the government's motion to dismiss."); *Franz v. United States*, 414 F. Supp. 57, 58 (D. Ariz. 1976) (no jurisdiction over un-exhausted claims of malpractice because "[w]hile this action arises from the same loss to the plaintiff, viz., the decedent's death, two distinct sets of negligent acts occurring at two different time periods are alleged . . . ."); *Staggs v. United States ex rel. Dep't of Health and Human Servs.*, 425 F.3d 881, 885 (10th Cir. 2005) (no jurisdiction over un-exhausted lack of informed consent claim and "deem[ing] it noteworthy that Staggs' complaint is [also] silent regarding lack of informed consent."); *Bethel v. United States ex rel. Veterans Admin. Med. Ctr. of Denver, Colo.*, 495 F. Supp. 2d 1121, 1124, 1125 (D. Colo. 2007) (no jurisdiction over negligent credentialing claim where administrative claim "revolves entirely around the details of the alleged negligent treatment of Mr. Bethel during the surgery that occurred on September 10, 2003" and rejecting plaintiff's "ongoing negligence" argument because unexhausted claim "involved alleged negligent acts that occurred separate and apart from the alleged medical negligence that occurred during and just before Mr. Bethel's surgery on September 10, 2003."); *but cf. Soriano v. United States*, No. 12-cv-4752, 2013 WL 3316132 (S.D.N.Y. July 1, 2013) (lack of informed consent claim exhausted even though not specifically mentioned in administrative claim where administrative claim set forth the cause of the injury, name of the employees involved, the date and location where the injury occurred and broadly attributed injuries to each and every aspect of care).

The *Soriano* case relied in part on *Johnson by Johnson*, 788 F.2d at 845, in holding that an informed consent claim is exhausted if the alleged malpractice "incident" is described sufficiently in the administrative claim. *Johnson by Johnson* involved a sexual assault of a minor victim by a postal carrier. The question was whether the administrative claim describing the

10

individual who perpetrated the assault and when and where it occurred was sufficient to exhaust a claim against the government for negligent supervision. In holding that the administrative claim was sufficient to exhaust the negligent supervision claim, *Johnson by Johnson* is within the line of jurisprudence under which some courts hold that certain claims are inherently or implicitly associated with an "incident" even if not specifically referenced in an administrative claim (e.g. informed consent related to an alleged incident of medical malpractice and supervision claims).[7] *See* 28 C.F.R. § 14.2(a).

*Johnson by Johnson* does not stand for the proposition that alleging an incident of medical malpractice inherently or implicitly exhausts all claims of malpractice occurring prior to

---

[7] Prior to *Johnson by Johnson*, a district court held that a plaintiff had exhausted a wrongful death claim based in part on an allegedly negligently performed surgery to remove a brain lesion. *Dundon v. United States*, 559 F. Supp. 469 (E.D.N.Y. 1983). The administrative claim provided as follows:

> Prior to discharge from the army 12/2/70 and thereafter, the deceased presented with behavior classical for an intercranial lesion but the V.A. failed to diagnose a brain tumor until or about 8/18/75. They kept treating him for a psychiatric disorder; by the time they finally worked him up for a brain tumor, five years had elapsed from when it should have been diagnosed until the time it was diagnosed.
>
> The deceased was treated for a psychiatric disorder with drugs and electroshock treatment when he had a brain tumor all the time. *In or about 11/75, he was finally operated on; as a result of his treatment he remained in the New York V.A. Hospital in critical condition from 10/75 till his death in September of 1977.*

*Id.* at 476 (emphasis in original). The claim regarding the surgery was exhausted in *Dundon* because the administrative claim alleged that, as a result of the decedent's treatment specifically including the surgery, the decedent remained in the hospital until his death. Further, in denying the administrative claim the VA itself referenced the location where the surgery was performed, evincing its understanding that the administrative claim encompassed the surgery. Here, the administrative claim mentions Mr. Legg's treatment prior to December 28, 2011 only to support the expert's declaration (and counsel's narrative) that Dr. Duque should not have prescribed someone with that profile Ambien and should have spoken with Mr. Legg's family. Neither the administrative claim itself nor the expert declaration links Mr. Legg's treatment leading up to his December 28, 2011 visit to malpractice by those providers. Additionally, unlike in *Dundon*, the VA here never responded to Plaintiff indicating that it understood the SF-95 to include all of the treatment that Mr. Legg received at the VA in the year before the December 28, 2011 visit.

11

the incident just because those claims happen to concern the same injured party and underlying medical condition(s). This is especially so where, as here, the party submits an expert declaration with an SF-95 that makes no such allegations, thereafter files a complaint and answers discovery that tracks the limited claim contained in the SF-95, and the additional negligence claims involve different standards of care, providers, and time periods. *See Schunk v. United States*, 783 F. Supp. 72, 81 (E.D.N.Y. 1992) (citing *Johnson by Johnson* and finding no jurisdiction over claims of alleged malpractice involving prescriptions of drugs other than the one identified in the administrative claim and/or at different facilities than those identified in the administrative claim because "[p]laintiff's notice of claim was insufficient to allow the government to evaluate these [other] issues . . . ."); *Kraut v. United States*, No. 86 C 1346, 1989 WL 29985 at *2 (E.D.N.Y. Mar. 22, 1989) (administrative claim that "[d]ue to medical malpractice, the late [plaintiff's] chest-incision separated following a quadruple bypass operation, causing . . . *related complications* and death" exhausted claims for initial surgery and subsequent surgeries to ameliorate condition) (emphasis added). If a claimed incident of malpractice by a physician performing a psychiatric outpatient visit for a patient she has never met before automatically exhausts all potential claims of negligence relating to the same medical condition it would defeat the purposes of the presentment requirement. It would also significantly expand the government's waiver of sovereign immunity contrary to the requirement that waivers of immunity be construed narrowly. *Lehman*, 453 U.S. at 161.

Exacerbating the jurisdictional defect here is that Plaintiff did not even plead in the Complaint the alleged instances of malpractice that her experts appear poised to assert at trial or mention them in her interrogatory responses in early 2015. This underscores that Plaintiff herself viewed the SF-95 as presenting a claim of negligence arising out of Mr. Legg's

12

December 28, 2011 visit and only later (presumably after consultation with the second expert) decided to try to expand the scope of the case. By then, however, the time to file a new SF-95 had passed, and Plaintiff did not even attempt to amend the Complaint and argue that the SF-95 was a sufficient basis to support jurisdiction over these new claims. 28 U.S.C. § 2401(b) (FTCA claim must be presented within two years after it accrues).

### B. Only Evidence Relevant to Plaintiff's Exhausted, Pleaded Claim is Admissible

Because only one malpractice claim was exhausted (and pleaded) the trial should be limited to evidence relevant to that claim. Otherwise, any resulting judgment runs a needless risk of being tainted by irrelevant, jurisdictionally defective evidence. *See* Fed. R. Evid. 401 (evidence is relevant if it has a tendency to make a fact more or less probable and that fact is of consequence in determining the action); Fed. R. Evid. 402 (irrelevant evidence not admissible).

The case of *Yeboah v. United States* is instructive. No. 99-cv-4923, 2000 WL 1876638 (S.D.N.Y. Dec. 26, 2000). In *Yeboah*, the plaintiff failed to exhaust, among other things, a claim that a fall had injured her knee, instead only exhausting claims that the same fall had injured her head, neck, and back. The government moved to preclude admission of evidence regarding the alleged injury to the plaintiff's knee because the court lacked jurisdiction. The district court granted the government's motion to preclude because "Ms. Yeboah's claim regarding injuries to her knee . . . [is] not properly before the Court, this Court must grant the Government's motion in limine precluding the admission of evidence regarding these claims since such evidence would be inadmissible under the Federal Rules of Evidence." *Id.* Further, even if the proposed evidence had some relevance to the plaintiff's other claims, the district court noted that it would still be excluded under Rule 403 because "its 'probative value would be outweighed by . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'"

13

*Id.* (quoting Fed. R. Evid. 403). *Yeboah* involved evidence regarding an unexhausted aspect of *injury* allegedly caused by the same act of underlying negligence that was exhausted, and the court still precluded the evidence. Here the case for exclusion is much stronger than in *Yeboah*. Plaintiff apparently intends to introduce evidence of *entirely different acts of alleged negligence by entirely different providers during an entirely different time period* than set forth in the SF-95 or the Complaint.

The error that Plaintiff would invite into this trial if permitted to introduce evidence on claims over which this Court lacks jurisdiction was demonstrated in *Bumgardner v. United States*. 469 Fed. App'x 414 (6th Cir. 2012). *Bumgardner* involved a suit against the VA alleging that the plaintiff's paralysis was caused by malpractice. Although not part of his administrative claim, the plaintiff also introduced evidence that the VA was negligent in causing him to suffer a stage four bedsore. The district court ruled in favor of the government on the paralysis claim and in favor of the plaintiff on the unexhausted bedsore claim. The Sixth Circuit affirmed the district court's judgment in favor of the government on the paralysis claim but vacated its judgment in favor of the plaintiff on the bedsore claim. This was because "plaintiffs' administrative claim related solely to the treatment Mr. Bumgardner received in Nashville in February 2006. No mention of the bed sore he later suffered in Memphis was found in the claim, or in the complaint filed in the district court." *Id.* at 2.

In certain circumstances a judge conducting a bench trial may defer ruling on a motion *in limine*. That approach may make sense where the evidence that ends up excluded is narrow (e.g. an informed consent claim appended to a substantive malpractice claim). *See Lewis v. United States*, No. 05-1676, 2008 WL 3927279 (D.S.C. Aug. 21, 2008). Where the evidence concerns wholly unrelated and jurisdictionally barred claims, the government respectfully submits that the

14

better approach is to exclude the evidence up front. Plaintiff's unexhausted and un-pleaded claims comprise more of the substance of Plaintiff's experts' reports than the exhausted claim.

Not only would the trial be significantly and needlessly expanded if the irrelevant evidence is admitted, but the government would be prejudiced as well. Its Answer was directed to the exhausted, pleaded claim. Had the additional claims that appear in Plaintiff's expert reports been exhausted, pleaded, or even included within her discovery responses the government likely would have raised different defenses (including the discretionary function exception) and also likely would have structured discovery differently. *See* 28 U.S.C. § 2680(a) (no liability of the United States for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.").[8] Accordingly, this Court should limit Plaintiff to offering evidence relevant to whether Dr. Duque was negligent on December 28, 2011. Fed. R. Civ. P. 401-403.

---

[8] Some of Plaintiff's evidence regarding the unexhausted/un-pleaded claims is also potentially barred by the private analogue doctrine. By their own terms, the government Guidelines upon which at least one of Plaintiff's experts bases his opinions do not set a standard of care even for VA practitioners. *See* 2010 VA/DOD Clinical Practice Guideline for Management of Post-Traumatic Stress ("They are not intended to define a standard of care and should not be construed as one."). In any case, deviation from the government Guidelines would be relevant in an FTCA case only if a doctor in private practice would need to comply with the same recommendations to satisfy the standard of care. *See generally Liranzo v. United States*, 690 F.3d 78, 89 (2d Cir. 2012) (discussing Second Circuit private analogue jurisprudence); *but cf. Laskowski v. United States Dep't of Veterans Affairs*, 918 F. Supp. 2d 301 (M.D. Pa. 2013) (discussing relevance of Guidelines but not addressing private analogue doctrine).

## IV. Conclusion

Plaintiff should be precluded from offering evidence of alleged deviations from the standard of care that were not included in her SF-95 or Complaint. This Court lacks jurisdiction over such claims; Plaintiff simply failed to exhaust her administrative remedies (or plead) her experts' new allegations. In addition, basic principles of relevance, efficiency, and fairness dictate that evidence regarding unexhausted and un-pleaded claims be excluded from the trial.

RICHARD S. HARTUNIAN
United States Attorney

By: _____
Michael D. Gadarian
Assistant United States Attorney
Bar Roll No. 517198
William F. Larkin
Assistant United States Attorney
Bar Roll No. 102013