# EXHIBIT G

June 19, 2015

Oliver N. Blaise, Esq.
Coughlin & Gerhart, LLP
99 Corporate Drive
Binghamton, NY 13904

Carla N. McKain, Esq.
McKain Law, PLLC
136 East State Street
Ithaca, NY 14850


Re: Jeffrey Max Legg


Dear Mr. Blaise and Ms. McKain:

I am writing to you at this time in order to report my findings and conclusions after

completing my comprehensive review and analysis of the relevant clinical and legal

materials pertaining to this case (Nancy Legg v. United States of America, Civil Action No.

3:14-CV-0838, United States District Court for the Northern District of New York). A

complete list of the relevant clinical and legal materials I reviewed and analyzed is set forth

in Appendix A. In reaching all of my opinions and conclusions in this case to a reasonable

degree of psychiatric certainty, I relied on my comprehensive review and analysis of the

relevant clinical and legal materials set forth in Appendix A, as well as on my education,

training, experience, and expertise as a physician board-certified in psychiatry.

Mr. Legg was born on ███████████ and died on January 3, 2012, at age 33. He

was originally from Texas and had been a victim of childhood sexual abuse as a pre-adolescent. There was a family history of psychiatric illness: his maternal grandfather suffered from possible Posttraumatic Stress Disorder ("PTSD") and Alcohol Abuse; his mother suffered from possible clinical depression; and his maternal grandmother and maternal great-grandmother suffered from Alzheimer's disease. He graduated from Austin College in 2000 with a B.A. degree in psychology. He decided to enlist in the Army in November 2011 (shortly after the September 11, 2001 attacks on the World Trade Center). Military service was something of a family tradition: both his father and maternal grandfather had served in the U.S. military. Mr. Legg was a scout in the First Cavalry and served with valor. From March 2004 through March 2005, he was on the ground at Camp Eagle in Sadr City, Iraq and had a number of extremely traumatic experiences. He was involved in multiple fierce combat engagements, exposed to Improvised Explosive Devices and ambushes, experienced heavy mortaring, was under fire himself in major fire fights, witnessed many of his fellow soldiers being shot and killed, and had to move the bodies of his dead comrades. He was promoted to the rank of Sergeant while in Iraq. He received an Honorable Discharge on December 31, 2005.  In early 2006, after discharge from the military, he worked as a program specialist at a facility in Texas that provided services and counseling to the homeless. After eight months, he was promoted to the position of case worker/social worker. Around that time, he married his wife, Nancy Ewing Meyer.

In April 2007, he was seen at the VA in Bonham, Texas for treatment of psoriasis. When he told the doctor at the VA that he had been experiencing "on and off suicidal thoughts," he was referred for a mental health assessment. He reported the following symptoms: recent suicidal ideation (with a history of suicidal ideation for the past two years), low motivation, low energy, fatigue, decreased concentration, intrusive thoughts, anxiety, a recent panic attack, feeling like crying sometimes, flashbacks, nightmares (about being stranded, lost, being somewhere by himself, or having his weapon jammed),

2

survivor guilt, weight gain, problems sleeping (for which he had been taking Ambien), and being easily startled. A suicide risk assessment performed at the time was negative. Mr. Legg reported difficulties functioning at his job (attendance problems, detachment, and difficulties concentrating and remaining focused at work because of the trauma he had experienced in Iraq); these difficulties eventually resulted in the loss of his job.

The VA diagnosed his condition as Depression NOS, Anxiety NOS, and Posttraumatic Stress Disorder ("PTSD") symptoms. He was prescribed Zoloft (an SSRI antidepressant medication). He was apparently given a service-connected disability rating of 30% for PTSD. He continued to receive treatment at the VA in Bonham through September 2007. His records indicated a history of binge drinking when he was younger, continuing panic attacks, suicidal ideation, anxiety, nightmares, detachment, and startle responses. After he lost his job, Mr. Legg trained to operate a sub shop franchise with his brother, Troy. He and his brother moved to Ithaca, New York in April 2008 to operate a sub shop franchise there. His wife, who was working as a teacher in Texas, joined him in Ithaca at the end of the school year.

## Mr. Legg's Treatment at the Syracuse VAMC: Initial Phase: from December 11, 2010 to March 7, 2011

On December 11, 2011, Mr. Legg was brought to the Emergency Department by his wife after an *aborted* (or *avoided*) suicide attempt while alone at work at his sub shop earlier that same morning. He had a well-thought-out plan of committing suicide, tied an electrical cord around his neck, and was going to lean forward until he stopped breathing; however, he reconsidered and changed his mind. He said that, when he realized what he was doing and the gravity of the situation, he went home, told his wife, and decided to seek help. He had been depressed on and off for several years, but was feeling more depressed over the past day or two. He identified the immediate precipitating factor as worrying that nobody (meaning his wife and brother) really cared if he was around. There was no history of a

3

prior suicide attempt. He had been experiencing suicidal ideation for some time with plans to hurt himself, but said "I've never taken it this far."

It was learned that he had suffered from symptoms of PTSD and Major Depression since 2006, following his discharge from the military. He had returned from a tour of duty in Iraq where he had a number of combat-related traumatic experiences. He had been treated at a VA in Texas in 2007 and had continued to take refills of medication (Sertraline, 150 mg/day and Wellbutrin, 150 mg/day) until mid-2008. He had not returned to the VA for mental health attention for the past 2-3 years. He endorsed symptoms of PTSD and Major Depression. A formal suicide risk assessment was performed. In the course of his evaluation, he gave conflicting versions of his substance abuse history: at one point stating that he never drinks excessively and doesn't use illicit drugs; at another point stating that he does drink alcohol weekly (maybe a couple of beers with dinner) and that he will binge drink infrequently to get drunk (maybe every couple of months). However, he qualified this by saying that he has not been drinking "in quite some time." He also said he has smoked marihuana "very occasionally."

On mental status examination, he was depressed and mildly anxious. He denied any current suicidal ideation. He declined an offer of voluntary admissions an inpatient, but was motivated to return for outpatient treatment. His diagnoses were Major Depressive Episode, history of depression, PTSD, rule out Bipolar II Disorder. He was discharged home after safety information and warning signs instructions were given to both him and his wife. He was given a seven day supply of medication (sertraline, 50 mg/day and hydroxyzine, 25 mg to be taken every 6 hours as needed, with a maximum of three daily doses). A follow-up appointment was scheduled at the NPOD Clinic for 12/13/10.

Mr. Legg was evaluated on 12/13/10. His mood was "down but better," with no suicidal ideation since his aborted suicide attempt. He had insomnia, poor energy and concentration, increased eating (with a 20 lb. weight gain since the summer), anhedonia,

4

and frequent guilty feelings. Nightmares and flashbacks were noted. Sertraline was discontinued because of intolerable side effects (akathesia and jaw clenching) and he was switched to another SSRI antidepressant medication, fluoxetine, 10 mg/day. On 12/14/11, an Alcohol Use Screen (Audit-C) was administered, which was positive (score=4). His responses indicated that, in the past year, Mr. Legg drank alcohol two to four times a month, had one or two drinks on a typical day, and consumed six or more drinks on one occasion monthly. According to the VA, "men who score 4 or higher drink above recommended limits and are at increased risks for harm."

On 12/22/11, Mr. Legg's mood was "good," He had fleeting suicidal ideation without plan or intent. Fluoxetine and hydroxyzine were continued at the same dosage. On 1/12/11, Mr. Legg continued to feel depressed (but "less low, down"). He had fleeting suicidal ideation with no intent or plan, feelings of guilt, difficulty sleeping, trouble concentrating, and decreased energy. He had nightmares, flashbacks, avoidance of crowded places, and sensitivity to "noises others may not hear." Substance use during this time was denied. The dose of fluoxetine was increased to 20 mg/day and Prazosin, 1 mg prn for nightmares was added to the regimen. On 2/7/11, Dr. Gay took over his medication management. He had nightmares, intrusive thoughts, and more frequent, intense flashbacks. His mood, sleep, concentration, appetite, and energy level were unstable. There was no suicidal ideation. Clonazepam, 1 mg at bedtime for sleep was added to the ongoing regimen of fluoxetine, hydroxyzine, and Prazosin. It was noted that the patient would benefit from psychotherapy. On 3/7/11, Dr. Gay noted that nightmares and flashbacks had diminished in frequency and intensity.

The patient had begun to make plans and talk about the future with a more hopeful attitude with his family. He was anxious and dysphoric. Sleep and concentration remained mildly unstable. Quetiapine, 50 mg at bedtime was added to the ongoing regimen. It was noted that his history and symptoms were consistent with PTSD and co-morbid depression.

It was noted "continue CBT/IP and supportive therapy," although there is no indication that any psychotherapy had been instituted yet.

### Clinical Comment # 1

During this initial phase of treatment (the three month interval after initiation of treatment), Mr. Legg was correctly diagnosed as suffering from PTSD and a co-morbid psychiatric condition, *i.e.* Major Depressive Disorder ("MDD").

Monotherapy with an SSRI antidepressant (sertraline) was discontinued because of intolerable side effects and he was switched to another SSRI antidepressant (fluoxetine). It is *strongly recommended* by the "VA/DoD Clinical Practice Guideline for Management of Post-Traumatic Stress" that initiation of treatment for the core symptoms of patients diagnosed with PTSD be with a so-called "first line agent," namely, an SSRI or SNRI antidepressant, which has been shown to have the greatest efficacy. The Guideline recommends that if the drug is not tolerated, it should be discontinued and another first-line agent substituted.

Accordingly, in this case Mr. Legg was started on sertraline and then switched to fluoxetine. Likewise, as set forth in the "VA/DoD Clinical Practice Guideline for the Management of Major Depressive Disorder (MDD)," an SSRI or SNRI Antidepressant is considered to be a first-line treatment for MDD and should be used to initiate treatment.

The goal of treatment for both PTSD and MDD is complete remission of symptoms and improvement of functioning and quality of life in major areas of adjustment, *e.g.* occupation, social, and family relationships. Assessment of Mr. Legg's clinical course over the initial period of treatment demonstrates only partial (insufficient) remission. The continued presence of significant symptoms increases the risk of future relapses and leads to a less favorable prognosis.

Under these circumstances, the Guideline for PTSD and the Guideline for MDD both

6

recommend a number of options for modification of the treatment plan including: increasing the antidepressant dose, switching to another antidepressant or another family of drugs, augmentation, applying adjunctive treatment measures, and/or initiating a different treatment modality. In this case, treatment modification measures were undertaken by increasing the dose of fluoxetine to 20 mg/day and adding Prazosin, quetiapine, and clonazepam to the medication regimen.[1] However, the treatment modifications in this case were instituted on a hit-or-miss basis, not based on a reliable, sound scientific approach to ensure that measures to maximize treatment efficacy were undertaken in the most timely fashion. As a result, the patient was allowed to remain in a state of partial (insufficient) remission throughout, thereby worsening the ultimate prognosis.

The Guidelines strongly recommend the utilization of certain validated and standardized psychometric instruments (*i.e.* structured questionnaires) that are responsive to meaningful changes in clinical status, in order to systematically assess, monitor, and measure the severity of symptoms and functional status at a given point in time. This is critically important, because by quantifying these parameters on an ongoing basis, mental health professionals are able to track the patient's overall symptom severity and response to treatment, as well as the specific symptoms that are improving or not with treatment. This allows for informed decision-making about effectively modifying the treatment regimen in the most timely manner. The standardized psychometric instruments that are most widely used for this purpose, because of their reliability, validity, and utility for assessing symptom severity, are the PTSD Checklist (PCL) for PTSD patients and the Patient Health

---

[1] The dose of fluoxetine should have been increased further until an effective dose level was reached. If this failed to achieve remission, a switch to an SNRI antidepressant (*e.g.* venlafaxine) or another family of drugs was warranted. Augmentation by adding a second drug (*e.g.* bupropion) to the existing antidepressant regimen was another option to consider, to accelerate an improved response to treatment. Initiating a different treatment modality, namely, psychotherapy, to be combined with the existing antidepressant therapy, was among the best alternative treatment strategies, in view of the patient's partial response to treatment. In fact, combination treatment (antidepressant medication and psychotherapy) should have been the initial treatment undertaken in this complex case, in view of the psychiatric comorbidity (PTSD and MDD).

7

Questionnaire-9 (PHQ-9) for MDD patients. Failure to use these standardized psychometric instruments (*i.e.* relying on *non-standardized* assessments in the course of treating these patients) is not good clinical practice. Non-standardized assessments are insufficient to quantify symptom severity and thus do not provide a sound scientific basis to monitor patient progress and make efficacious treatment decisions accordingly. It is analogous to driving around in a haphazard manner, guided only by ill-defined impressions and guesswork, trying to find your way without a GPS, rather than choosing to use a GPS device to locate your position and direction with pinpoint precision,

The Guideline states that, *at a minimum*, providers should perform a brief PTSD symptom assessment at each treatment visit and consider using a validated PTSD symptom measure, such as the PTSD Checklist (PCL). The Guideline goes on to say that PTSD patients should have a comprehensive re-assessment and evaluation of treatment progress at least every 90 days after initiating treatment (perhaps with greater frequency for those in active treatment). This is required to monitor changes in clinical status and revise the treatment plan accordingly. The Guideline emphasizes that these comprehensive re-assessments and evaluations should include a validated PTSD symptom severity measure, such as the PTSD Checklist (PCL). Likewise, in MDD patients, a measure of depressive symptomatology, such as the Patient Health Questionnaire-9 (PHQ-9) should be administered, starting at the time treatment is initiated, to monitor treatment response after 4-6 weeks have elapsed, then after each change in treatment, and periodically until full remission is achieved. These validated instruments can be scored as a continuous measure of progress (or lack thereof) over time, a longitudinal record of symptom severity, to scientifically assess and re-assess the patient's clinical status and monitor the treatment response. Failure to optimize treatment as expeditiously as possible to achieve full remission will result in refractoriness, more relapses, and a poor outcome. *The requisite validated psychometric instruments described above were never utilized at any time during*

8

*the entirety of the three month initial period of treatment.* It was a deviation and departure from the standard of care to fail to utilize these scientifically validated instruments to guide and modify the treatment plan on the most efficacious basis. Dr. Gay failed to utilize these validated instruments (as recommended in the Guidelines) to guide and modify his treatment along the lines indicated in footnote number 1 above. These deviations and departures from the standard of care caused the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

It was also a deviation and departure from the standard of care to fail to assign a Mental Health Treatment Coordinator ("MHTC") to Mr. Legg's case. The MHTC is responsible for the coordination and development of all facets of the patient's treatment plan, to ensure that the treatment plan is monitored and documented, including tracking progress in the care delivered, the outcomes achieved, and the goals attained. The treatment is modified when necessary. Dr. Gay, who was providing medication management for the patient, should have been utilizing the validated psychometric instruments discussed above, in order to guide and modify his treatment decisions. He failed to do so. However, this failure could have been corrected, if oversight by a MHTC had coordinated and monitored the development of the patient's treatment plan. Proper coordination by the MHTC would have resulted in collaboration with Dr. Gay to make certain the   psychometric instruments described above were utilized, to monitor and track the patient's progress, improve the level of treatment provided, and avoid an unsatisfactory outcome. None of this was done in this case. The MHTC also must collaborate with the Suicide Prevention Coordinator to ensure that a patient who has survived a suicide attempt is provided with increased monitoring and enhanced care. This was also not done. These deviations and departures from the standard of care caused the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

It was also a deviation and departure from the standard of care to fail to initiate

9

treatment with a combination of antidepressant medication and psychotherapy, in view of the fact that this was a complex case involving psychiatric comorbidity (PTSD and MDD). According to the Guideline, the concurrent use of antidepressant medication and psychotherapy would have maximized symptom reduction and resulted in more rapid improvement in outcome. Combination treatment was not even considered until 2/7/11, when Dr. Gay recognized that adding psychotherapy to the regimen would benefit the patient. However, another month went by and psychotherapy had still not been started (although in his note on 3/7/11, Dr. Gay mistakenly believed it had). This is another example of the failure to coordinate all facets of the patient's treatment plan. The coordination of various disciplines and specialist services is especially relevant for patients with chronic PTSD and co-morbidity such as Mr. Legg. Even after Dr. Gay had recognized the benefit of adding psychotherapy to the treatment plan, there was a continuing failure of coordination to implement his recommendation. These deviations and departures from the standard of care caused the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

It was also a deviation and departure from the standard of care not to re-assess the patient for co-occurring alcohol use, after he scored positive (score=4) on the Alcohol Use Screen on 12/14/10. He should have been re-assessed periodically to determine whether continuing or intermittent alcohol use was a confounding factor in his failure to achieve full remission of either PTSD or MDD. Alcohol use contributes to the severity and chronicity of anxiety and depression and may inhibit improvement of PTSD and MDD. The Guidelines stress the critical importance of comprehensively assessing and, if present, treating any form of substance abuse, in order to improve the capacity of PTSD and MDD treatments to effect positive change. Proper coordination of the treatment plan would have initiated indicated services by referral to a Substance Use Disorder specialist. This was not done by Dr. Gay or anyone else. These deviations and departures from the standard of care caused

10

the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

It was also a deviation and departure from the standard of care for Dr. Gay to add clonazepam to the treatment regimen. Clonazepam is a benzodiazepine medication which is widely used in psychiatry for symptomatic control of insomnia and anxiety. However, according to the Guideline, there is no evidence supporting the effectiveness of benzodiazepines in treating the core symptoms of PTSD. The risks outweigh the benefits. Benzodiazepines actually potentiate the acquisition of fear responses or interfere with the extinction of fear conditioning, thereby worsening recovery from trauma. Moreover the Guideline explicitly states that benzodiazepines are relatively contraindicated in combat veterans with PTSD (a group with a very high incidence of co-morbid substance abuse), because of their great potential for addiction. Once initiated, benzodiazepines can be very difficult, if not impossible, to discontinue due to significant withdrawal symptoms compounded by the underlying PTSD symptoms. This deviation and departure from the standard of care caused the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

On 3/7/11, two notes were entered into the record by Bethany D. Joncas, LMSW (aka Bethany D. Ryan, LMSW), a social worker who was the Polytrauma Case Manager and who also worked in the OEF/OIF Program. The notes indicated that Mr. Legg's post-deployment screening had been completed and appropriate evaluation had been initiated at the North Texas VA on 4/2/07, about four years previously. The notes also indicated that attempts were made to contact Mr. Legg to introduce him to the Syracuse OEF/OIF/OND Program and see if he had any needs. Three telephone calls were made to him and then a certified letter was sent to him, but contact was never established. It was noted (for the benefit of any providers he had, such as Dr. Gay) that if he presents with any issues, please feel free to refer to the above Program for any additional support or assistance.

11

Receipt of these notes was acknowledged by Dr. Gay on 3/7/11. At her deposition, Ms. Joncas testified that she never followed up with further efforts to contact Mr. Legg after the telephone calls were made and the certified letter was sent. She never spoke with or coordinated with Dr. Gay (nor did he with her) to enlist his help in contacting the patient (Dr. Gay was seeing the patient that very day, 3/7/11, for medication management) and to discuss whether the patient required ongoing case management or other needed services. For example, had she spoken with Dr. Gay, she would have learned that the patient needed psychotherapy services, but still wasn't receiving them. She could have expedited that connection and thereby avoided the delay in initiating psychotherapy. Mr. Legg, who had a number of "red flags" (Ms. Joncas's term), in view of his recent aborted suicide attempt and ongoing substance abuse, was never successfully contacted by Ms. Joncas; he was never included in Ms. Joncas's ongoing team meetings, to be followed, tracked, and checked in with periodically, in order to assist him to connect with other needed services (*e.g.* psychotherapy services, assignment to a MHTC, or the SUD Program). The team should have continued to follow and keep tabs on a "red flag" patient such as Mr. Legg, to help him navigate the VA system until his needs were completely met. Ms. Joncas was not familiar or even aware of the existence of the VA Guidelines for PTSD, MDD, or SUD. She failed to perform a general psycho-social assessment, screening, or any evaluation whatsoever to update what had been done nearly four years before at the North Texas VA (and before the aborted suicide attempt in December 2010), in order to identify what current issues the patient was presenting with. In fact, Ms. Joncas never met Mr. Legg. Her multiple failures to evaluate, communicate, coordinate, or continue to follow and check in with Mr. Legg, a patient with multiple unmet needs, permitted him to fall between the cracks. These deviations and departures from the standard of care by Ms. Joncas caused the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

**Mr. Legg's Treatment at the Syracuse VAMC: Early Continuation Phase: from April 11, 2011 to July 20, 2011**

On 4/11/11, Dr. Gay noted that the patient was still dysthymic and his mood, sleep, concentration, appetite, and energy level were stable. He noted that the patient has responded well to fluoxetine and will continue to benefit from it. Once again, he recommended psychotherapy to alleviate the patient's depressed mood and restore him to his baseline level of functioning. (As a result of the failure of coordination of all facets of the treatment plan, as discussed above, psychotherapy had still not been instituted, although Dr. Gay had been recommending it since 2/7/11.)

On 4/19/11, Mr. Legg finally began psychotherapy with a social worker, Gregory G. Moss, LCSW-R, who, in addition to being his psychotherapist, was now identified as his Mental Health Treatment Coordinator as well. Mr. Moss wrote a lengthy note, reviewing in detail the patient's past history of longstanding depression and PTSD symptoms. He noted that the patient uses cannabis daily to help him sleep. He noted that the patient cut back on his consumption of alcohol to only a few beers (three beers in three months), except for occasional binge drinking with friends. In addition to manifesting the classic symptoms of PTSD, the patient had suicidal ideation without a plan every couple of weeks or so, insomnia, difficulty concentrating, low energy level, and loss of interest in activities he once enjoyed. The diagnosis was MDD and PTSD. After going over a number of treatment options with the patient, Mr. Moss administered a validated PTSD symptom measure (PCL). This was the very first time a PCL had been administered since treatment was initiated on 12/11/11. Mr. Legg's response to each of the following items on the PCL Questionnaire was "extremely:" i) trouble falling or staying asleep? ii) feeling irritable or having angry outbursts? iii) having difficulty concentrating? iv) being "superalert" or watchful or on guard? v) feeling jumpy or easily startled? In response to the question "How difficult have these problems made it for you to do your work, take care of things at home, or get

13

along with other people?" he said "Very difficult." His total score on the 17-item PCL was 63, indicating *high severity of PTSD symptoms*. On 5/3/11, the patient was seen by Mr. Moss for individual psychotherapy. He said he was doing "pretty well." He complained of low level depression with a few bad days, insomnia, and feeling self-critical because he was unable to get rid of the PTSD symptoms. There was no suicidal ideation. He was seen on 5/10/11 by Dr. Gay for medication management. During the interval, he was having intrusive thoughts and images with an associated intense emotional response. Nightmares and flashbacks had decreased. His mood, sleep, concentration, and energy level were approaching stability. On mental status examination, he was dysthymic and anxious. There was no suicidal ideation. On 5/25/11, he saw Mr. Moss and felt his mood was better. Sleep had improved, but he was having more vivid dreams and nightmares. He expressed guilt feelings about being scared in combat, but was reassured that it was normal to feel scared in that situation. There was no suicidal ideation. He reported having one alcoholic drink since the previous session and decreased marihuana use to once every two weeks. His efforts to cut back were supported and encouraged. On 6/14/11, he saw Dr. Gay, who concluded he had responded well to treatment as indicated by his current stable mood, sleep, concentration, and energy level. There was less difficulty with early morning intrusive, distressed thoughts and flashbacks had decreased. There was no suicidal ideation. On 6/14/11, he saw Mr. Moss again. He reported that his sleep had improved, with less frequent nightmares. His energy level had improved and his concentration varied. He felt he needed "to do penance for his friends dying, for being fearful in combat." There was no suicidal ideation. Specialty treatments for PTSD were reviewed with the patient who was considering them. On 6/28/11, he saw Mr. Moss and reported feeling more depressed, with a lower tolerance level for stress. He was dreaming less, but noticed an increase in hypervigilance, with intrusive memories occurring about every other day. There was no suicidal ideation. He was looking forward to going on a cruise with his wife. He was given

14

handouts on specialized forms of psychotherapy for PTSD. On 7/20/11, he saw Mr. Moss and reported his mood was more depressed from time to time (with difficulty getting out of gloomy moods). He was having fewer nightmares, but reported having a few nightmares of seeing death. (Thoughts or preoccupations about death are one of the important diagnostic criteria for MDD.) On mental status examination, he was depressed. There was no suicidal ideation. Intrusive memories continued, but he stated his PTSD symptoms were less debilitating and more manageable. He was still considering the specialized forms of psychotherapy for PTSD but not ready to commit yet. There was a discussion with the patient about Dr. Gay, his treating psychiatrist, leaving the clinic. The patient's concerns, about the separation from his regular doctor (who had been treating him since 2/7/11) and having to start over seeing someone new, were addressed. (It was, or should have been, obvious that Mr. Legg was apparently very sensitive to any perceived rejection or abandonment. His abortive suicide attempt on 12/11/11 had been triggered by his worry that nobody (meaning his wife and brother) really cared if he was around.)

**Clinical Comment # 2**

During the early continuation phase of treatment (4/11/11-7/20/11), Mr. Legg continued to manifest only partial (insufficient) remission. As noted above, the continued presence of significant symptoms increases the risk of future relapses and leads to a less favorable prognosis. Mr. Legg demonstrated an up-and-down clinical course and his symptoms fluctuated, but were never controlled on a sustained basis. Suicidal ideation seemed to diminish, but he reported experiencing continuing feelings of guilt, the need "to do penance," and nightmares of seeing death. He was still drinking occasionally and relying on marihuana to help him sleep, although he indicated he was trying to cut back. A PCL was administered once, but no serial measures of symptom severity relative to PTSD were done to monitor his progress and no measures of MDD symptom severity to monitor his progress were done at all. Accordingly, no modifications of the treatment plan were made

15

based on standardized validated assessments which quantified his response (or lack thereof) to treatment measures. Psychotherapy was belatedly added to the treatment regimen on 4/19/11 (although it had been recommended by Dr. Gay as far back as 2/7/11 and, as discussed above, should have been instituted at the initiation of treatment in December 2010, but had not been, due to ineffective coordination of the treatment plan ).

It was a deviation and departure from the standard of care to fail to monitor the patient's progress in treatment by performing serial measures of symptom severity and responses to treatment with standardized, validated instruments (e.g. the PCL and the PHQ-9), in order to make effective and timely treatment modifications. A PCL was performed only once, on 4/19/11, which documented the presence of a high severity of PTSD symptoms (score=63). However, in order to monitor patient progress, quantifying up-or-down *changes* in symptom severity must be ascertained over time by repeatedly performing the PCL at intervals. Generally a 10-20 point change is clinically meaningful for determining whether or not a patient has responded to treatment.  This was not done and there was thus no basis for comparison to quantify his progress in treatment. Measuring the severity of MDD symptoms utilizing the PHQ-9 was not done at all. (PHQ-9 scores of 5-14 indicate a mild severity level; 15-19 indicate a moderate severity level; and 20 or greater indicate a severe level.) Accordingly, there was no scientifically reliable and valid basis to institute indicated modifications of his treatment. Mr. Moss failed to speak to Dr. Gay and compare notes (and vice versa), to remedy these deficiencies and omissions, in order to coordinate the patient's mental health care according to the standards set forth in the relevant Guidelines. These deviations and departures from the standard of care caused the patient's psychiatric condition to progress unchecked and fail to achieve a full remission.

The deviations and departures from the standard of care resulting from the failure to assign a MHTC have been noted above. The primary role of the MHTC is to assist coordination of the patient's mental health care as needed and clinically indicated; and to

16

serve as the point of contact for the patient and relevant treatment providers. However, even after the belated designation of Mr. Moss as the patient's MHTC as of 4/19/11, there continued to be significant failures to coordinate all facets of the treatment plan, to monitor and document the implementation of the treatment plan, to track progress in the care delivered, the outcomes achieved, and the goals attained, and to revise the treatment plan when necessary. In this case, the coordinator was clearly failing to coordinate in multiple areas:

- There is no indication that the MHTC spoke to, compared notes, or collaborated with Dr. Gay (and vice versa) to coordinate the implementation of effective medication management, by ensuring that validated psychometric instruments were henceforth going to be used as a scientific basis for treatment decisions. In fact, there was no indication of person-to-person communication or collaboration with Dr. Gay in any way, to exchange information about the patient's clinical condition, to work together so that "one hand knows what the other hand is doing," and coordinate medication management and psychotherapy in the setting of the always difficult "split treatment" arrangement. It has been said that the difficulties inherent in split treatment situations, which involve a patient, a psychotherapist, a psychiatrist managing medication, and a pill, can become more complex than landing patterns of airplanes at an overcrowded airport. That is why it is so essential to have ongoing communication and coordination between the psychiatrist and the therapist, which unfortunately was not done in this case.

17

- Although Mr. Moss discussed specialized forms of psychotherapy for PTSD with the patient, he should have more strongly and persistently influenced the patient in every way possible to start this form of treatment. Coordination with Dr. Gay and even the patient's wife should have been undertaken to persuade the patient of the critical importance of this issue. Especially in a patient such as Mr. Legg, with chronic, severe PTSD and complicating co-morbid conditions, it was vital for him to receive the evidence-based most effective form of psychotherapy

  available, namely a trauma-focused psychotherapy, such as prolonged exposure therapy.

- Mr. Moss did discuss with the patient his intermittent use of alcohol and more prominent use of marihuana and he did encourage and support his efforts to cut back. However, this was not sufficient. Substance use was such a critical issue, in terms of interfering with a good response to treatment for PTSD and MDD, that Mr. Moss should have more strongly and persistently influenced the patient to be assessed and treated by a Substance Use Disorder ("SUD") specialist and then coordinated the implementation of the referral. In addition, he should have taken every possible step to communicate and coordinate with Dr. Gay and the patient's wife to persuade the patient to acquiesce.

- Mr. Moss failed to collaborate and coordinate with the Suicide Prevention Coordinator and the Polytrauma Case Manager to

18

ensure that this at-risk, "red flag" patient was provided with
increased monitoring and enhanced care. By the same token,
they likewise failed to reach out to collaborate and coordinate
with him and/or Dr. Gay to achieve these goals.

Mr. Moss, at deposition, didn't know the significance of a score of 63 on the PCL he
administered, *i.e.* that it indicated the presence of a high severity of PTSD symptoms.
Accordingly, he was unaware of the recommendation to increase the frequency of
psychotherapy sessions under the circumstances. He failed to perform a validated test to
measure the severity of symptoms of Major Depressive Disorder. He was unfamiliar with
the relevant Guidelines and the recommendations they set forth regarding the necessity to
use validated instruments to monitor symptom severity on an ongoing basis and modify the
treatment plan accordingly. These deviations and departures from the standard of care
caused the patient's psychiatric condition to continue to progress unchecked and fail to
achieve full remission.

It was a deviation and departure from the standard of care for Mr. Moss to fail to
explore and deal with critically important issues in psychotherapy with the patient, including
the areas of work, family, the marital relationship, and other social relationships. On
4/19/11, on the PCL questionnaire, the patient had disclosed that there were significant
problems in these areas that made it very difficult for him. Yet there is no evidence that any
of these areas was explored, discussed, processed, or resolved in the course of
psychotherapy. As a result, these problem areas continued to constitute major psychosocial
stressors with an adverse impact on the patient's psychiatric condition and response to
treatment. He failed to have Mr. Legg's wife participate after the initial visit, to obtain input
from her regarding these issues. These deviations and departures from the standard of
care caused the patient's psychiatric condition to continue to progress unchecked and fail
to achieve full remission.

19

**Mr. Legg's Treatment at the Syracuse VAMC: Late Continuation Phase: from August 10, 2011 to November 28, 2011**

On 8/10/11, the patient told Mr. Moss he was "interested in what else may help." This appeared to be the ideal opening for Mr. Moss to exercise all of his influence as MHTC by re-visiting a number of critically important issues, namely, making a persistent effort to persuade the patient to seek the most effective form of psychotherapy available, *i.e.* trauma-focused psychotherapy (which the patient was still considering) and making a persistent effort to persuade the patient to have an assessment (and treatment as needed) by an SUD specialist. Mr. Moss allowed the opportunity to pass and failed to educate and engage the patient in a discussion of these two key measures that were vital components of an effective treatment plan. (He was unfamiliar with the relevant Guidelines, as noted above, and as a result didn't know the recommendations set forth in regard to these key measures.) The patient reported an improved mood with occasional periods of depression, vivid dreams in the A.M. when he doesn't take sleep medication, worries about feeling too groggy during the day, and no suicidal ideation. The patient said he's "considering seeing the NPOD to discuss meds." As MHTC, Mr. Moss should have already been aware that since his last session with Dr. Gay on 6/14/11 (and after learning that Dr. Gay was leaving the clinic), the patient had failed to return to NPOD for continuing medication management. Mr. Moss should have coordinated the patient's assignment to a new psychiatrist for medication management to ensure that he would be monitored on an ongoing basis and was taking his medications as prescribed. These basic arrangements had not been made and now, even after the patient had alerted him about the situation, Mr. Moss still didn't get the message and take any steps to coordinate treatment with Ms. Joncas (nor did she with him) or anyone else. Mr. Moss did not bring up for discussion the patient's previously expressed concerns about Dr. Gay leaving the clinic and having to start over again with a different psychiatrist.

20

On 9/7/11, the patient indicated he still had not gone to the NPOD, but planned to go the following week. Mr. Moss said he would contact the supervisor about an appointment time. At this point, the patient had not received any medication management for almost three months. Mr. Moss did not inquire about whether the patient was taking his medications as prescribed or probe about his feelings about Dr. Gay leaving. The patient was anxious and reported continuing difficulty falling asleep and complained that the quetiapine left him feeling groggy. He was having nightmares a couple of times a week and intrusive thoughts about various traumatic combat experiences. He was wondering and worrying about whether he had bipolar disorder. No inquiry about suicidal ideation was documented.

On 9/13/11, the patient saw Dr. Kotz as a walk-in. He had not received any medication management since Dr. Gay left, a period of three months. There was no discussion of his feelings about Dr. Gay leaving him or his concerns about starting again with a different psychiatrist. He reported more difficulty over the past month, which he said was why he came in. He denied any significant psycho-social stressors and said he had a loving relationship with his wife. He was experiencing much more depression and much more difficulty falling asleep. He had periods of increased irritability and impaired concentration. He was having chronic suicidal ideation, but no worse than in the past. At times, he was "bombarded" with thoughts about all the things he was going to do or would like to do, about planning for the future, and had increased motivation, but was easily distracted and had difficulty completing tasks. He was having heavy marihuana use, up to smoking daily as a form of self-medication. He was consuming 1-2 drinks once a month. There were no  recreational or leisure activities he enjoyed. A PCL was administered. (It had been nearly five months since his last PCL on 4/19/11.) His response to each of the following items was "extremely:" i) having physical reactions...when something reminded you of the stressful experience from the past? ii) feeling distant or cut off from other

people? iii) trouble falling or staying asleep? iv) feeling irritable or having angry outbursts? v) having difficulty concentrating? In response to the question "How difficult have these problems made it for you to do your work, take care of things at home, or get along with other people?" he said "Very difficult." His total score was 67, indicating *high severity of PTSD symptoms*. His score was worse than it had been on 4/19/11, when it was 63. In other words, after an interval of nearly five months, treatment measures had failed to improve the severity of his PTSD symptoms. No measure of his MDD symptoms (such as the PHQ-9) was done. His diagnoses were PTSD, MDD, rule out Bipolar II Disorder, Cannabis Dependence, and Alcohol Abuse in Full Sustained Remission. Despite the validated determination that no improvement in PTSD symptoms had been achieved over the past five months, the treatment plan was for the most part continued without undertaking significant modifications (such as increasing the dose of fluoxetine or switching to another antidepressant, augmentation, and strongly repeating recommendations for trauma-focused psychotherapy and referral to an SUD specialist) The treatment plan was to continue fluoxetine 20 mg daily, increase Prazosin upward gradually from 1 mg/nightly to 6 mg/nightly, discontinue hydroxyzine and quetiapine, and continue individual psychotherapy with Mr. Moss. On 10/4/11, the patient saw Dr. Kaul who was taking over his medication management.  The patient continued to be mildly depressed, with low energy and low motivation (staying at home when not at work). There was no suicidal ideation. Nightmares had significantly improved with increased doses of Prazosin. He continued to smoke marihuana every night to help him sleep, but said he was amenable to cutting down. (It was discussed with the patient that, in order to receive stimulant treatment for his adult ADHD, he would have to cut down marihuana use.) He denied drinking alcohol. He was avoidant of becoming involved in an exposure-based therapy at this time. His diagnoses were unchanged. The treatment plan was to increase the dose of fluoxetine to 30 mg/day, continue Prazosin at 4 mg/nightly, and add Doxepin for sleep at 5 mg/nightly. Future

22

treatment for ADHD and future treatment with an exposure-based psychotherapy (ERP) was to be considered. Individual psychotherapy with Mr. Moss was to continue.

On 10/6/11, the patient told Mr. Moss he was sleeping better with Doxepin, with a few, less intense nightmares. He had intrusive thoughts a couple of times a week. His energy level was low. He was having periods of depression, but feeling more hopeful overall and making plans to enter college in the spring. He reported his intention to stop using marihuana because he wants to start treatment for ADHD. Mr. Moss didn't pursue this by emphasizing that by far the most important reason to stop abusing marihuana was because this had very likely been interfering with treatment for PTSD and MDD and he should see an SUD specialist to help him stop. The patient was still considering exposure therapy. Mr. Moss didn't renew efforts to persuade him to stop procrastinating and seek exposure therapy, because it was the most effective way to improve his PTSD. No inquiry was made about suicidal ideation.

On 10/25/11, the patient didn't show up for individual psychotherapy with Mr. Moss. He left a voicemail message that he had overslept and would call back to reschedule in a day or two. *The patient never saw Mr. Moss again.* There is no indication that he ever called back and, astonishingly, no indication that Mr. Moss ever tried to contact him, reach out to his wife, or make any effort whatsoever to have the patient come in to resume psychotherapy, or at least come in to discuss why he was dropping out and the likely adverse consequences on treatment outcome. Mr. Moss never communicated to Dr. Kaul that the patient had dropped out of psychotherapy without any explanation. There are no further notes in the record by Mr. Moss either in his role as psychotherapist or in his role as MHTC.

On November 8, 2011, the patient saw Dr. Kaul for only 10 minutes. Although he had come on time, the psychiatrist had not been notified of his presence in the waiting room. His sleep had normalized on Doxepin and his mood and irritability had improved with

23

the increase in fluoxetine dosage (although he was still irritable from time to time). There was no suicidal ideation, intent, or plan. Fluoxetine was further increased to 40 mg/day. It is noteworthy that Dr. Kaul wrote "continue individual psychotherapy with Gregory Moss," indicating that there had been no coordination and he remained unaware that the patient had not returned for psychotherapy.

On 11/28/11, the patient returned for a brief appointment with Dr. Kaul. He was feeling much better on the increased dose of fluoxetine, with no side effects. There was no suicidal ideation, ideation, intent, or plan. He was continuing marihuana use. Dr. Kaul counseled him about the risks involved and, as he had so many times before, the patient again indicated he was considering quitting. Fluoxetine and Doxepin were continued at the same doses. Prazosin was tapered and discontinued. Dr. Kaul noted "Continue individual psychotherapy with Gregory Moss," again indicating that no coordination or communication had been undertaken to inform him that the patient had no longer been receiving psychotherapy for over a month.

**Clinical Comment # 3**

During the late continuation phase of treatment (8/10/11-11/28/11), Mr. Legg continued to manifest only partial (insufficient) improvement. He continued to demonstrate an up-and-down clinical course. his symptoms fluctuated, but were never controlled on a sustained basis. A repeat PCL (after an almost five month interval) was scored 67, worse than it had been on 4/19/11. A number of deviations and departures from the standard of care continued to occur with the net result that the patient was not receiving an adequate level of good mental health care: despite the scientifically quantified indication he was not improving on the treatment regimen, strong measures to modify treatment were not taken at the time. Dr. Kotz should have instituted more robust modification of the treatment plan as outlined in footnote number 1 above. The patient was noted to be "chronically suicidal," nonetheless, no direct communication/coordination was undertaken by Dr. Kotz with Mr.

Moss, Ms. Joncas, or the Suicide Prevention Coordinator to address this. Likewise they each failed to coordinate with Dr. Kotz or each other to address this issue. Heavy marihuana abuse continued unabated on a nightly basis, although the patient continued to reassure his providers that he was amenable or intending to cutting back or stopping. (But there is no indication he was ever induced by any of his providers to receive the help necessary to assist him to do so). He admitted to having 1-2 drinks occasionally at most. His concerns about Dr. Gay leaving had not been worked through or resolved in psychotherapy and he may have been acting out by discontinuing attendance for medication management. In any case, the necessary coordination of the treatment plan to ensure his medication management would transition smoothly without interruption was not undertaken by Mr. Moss or Ms. Joncas and he didn't attend the NPOD for about three months. He abruptly dropped out of psychotherapy unilaterally and without any explanation at the end of October and never returned. Mr. Moss never reached out to have him return to psychotherapy, even if only to discuss the issue. The psychiatrist managing his medication needs and Ms. Joncas were never made aware by Mr. Moss that his psychotherapy had stopped. As a result of these multiple failures of communication and coordination, Mr. Legg missed months of critically important treatment interventions, both months of medication management and months of Individual psychotherapy; in addition, he never received assessment and treatment for his heavy abuse of marihuana and never was induced to engage in trauma-based psychotherapy. Serial administration of validated instruments was not undertaken by Mr. Moss or the treating psychiatrists, as recommended by the Guidelines. At his deposition (at page 32), Mr. Moss indicated his understanding of his role: to "see what's going on in the record, whoever else is providing care---and make determinations if---if something else needs to happen." There is abundant evidence that he had failed abysmally to do this. During this period, these multiple deviations and departures from the standard of care caused Mr. Legg's psychiatric condition to continue to progress

unchecked and fail to achieve full remission.

It was a deviation and departure from the standard of care to fail to perform serial measures of symptom severity with validated psychometric instruments on a more frequent and regular basis. The only two PCL's ever administered (on 4/19/11 and 9/3/11, an interval of five months) showed a worsening of his PTSD. No measures of MDD symptom severity were ever done. There was thus a grossly inadequate scientific basis established on which to make timely modifications of treatment throughout. On 10/4/11 and again on 11/8/11, the dose of fluoxetine was finally increased by Dr. Kaul to more therapeutic levels. This should have been done several months earlier by Dr. Gay and Dr. Kotz. The failure to monitor his progress with validated instruments and modify the treatment plan as indicated in a timely manner had set back his progress in treatment by many months. Dr. Kaul had started to modify the treatment plan by increasing the dose of Fluoxetine to more effective therapeutic levels, but it is unclear why he discontinued the Prazosin which was effectively treating the patient's nightmares (and presumably helping him to sleep better). Dr. Kotz and Dr. Kaul were both unfamiliar with the VA Guidelines for PTSD and MDD, which is reflected in their mismanagement of the patient's monitoring and treatment. These deviations and departures from the standard of care caused his psychiatric condition to continue to progress unchecked and fail to achieve full remission.

It was a deviation and departure for the MHTC to fail to coordinate in multiple areas:

- Continuing failure to coordinate with the treating psychiatrists (in all the ways detailed above) and now, even worse, to the extent of being unaware that the patient was not attending medication management sessions for months and failing to coordinate a smooth transition without interruption to a new psychiatrist following Dr. Gay's departure.

- Continuing failure to follow up with stronger measures to

coordinate the implementation of trauma-focused

psychotherapy, as discussed above.

- Continuing failure to follow up with stronger measures to
  coordinate the implementation of assessment and treatment by
  an SUD specialist.

- Continuing failure to collaborate and coordinate with Ms.
  Joncas and the Suicide Prevention Coordinator, especially in
  view of the fact that the patient was now considered to be
  "chronically suicidal."

These deviations and departures from the standard of care caused the patient's psychiatric
condition to continue to progress unchecked and fail to achieve full remission.

It was a deviation and departure from the standard of care for Mr. Moss to passively
acquiesce in the patient's abruptly unilaterally dropping out of psychotherapy, without
making strenuous efforts to reach out to the patient and his wife to have him return to
treatment, even if only to have an opportunity to discuss the issue and make acceptable
alternative arrangements. As noted above, the treating psychiatrist was not even informed
of this development. It appears that, if the patient was going to drop psychotherapy, Mr.
Moss was going to drop the patient. Thereafter, Mr. Moss completely disappeared from the
patient's treatment records, without entering any subsequent notes, either in his role as
psychotherapist or as MHTC. In this regard, he failed to comply with the most fundamental
professional duty of the MHTC, as set forth specifically in the VHA Handbook 1160.01,
which states that the MHTC must ensure that *"regular contact is maintained with the patient
as clinically indicated as long as ongoing care is required."* Mr. Moss, the Mental Health
Treatment Coordinator, failed to coordinate even his own treatment of the patient. At his
deposition, Mr. Moss admitted that he had not reached out to the patient to return to
psychotherapy, even for one session to clarify the issues involved. Mr. Moss indicated he

27

was satisfied that the patient was still connected to treatment by attending the NPOD for medication management. This cavalier if not callous approach failed to take into consideration the patient's critical need for combined therapy (both medication and psychotherapy). As indicated above, Mr. Moss was not familiar with the recommendations of the Guidelines that set forth the patient's treatment needs in this regard. He failed to communicate and coordinate with the treating psychiatrists, Ms. Joncas, or anyone else about these important treatment issues. Likewise, they failed to communicate or coordinate with him as well. These deviations and departures from the standard of care caused the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

It was a deviation and departure from the standard of care for Mr. Moss to continue to fail to explore and deal with critically important issues in psychotherapy in all the areas discussed above.  Now, even worse, these failures extended further to include failing to work through the patient's feelings and concerns about Dr. Gay's departure and, most egregiously, failing to deal with the patient's abruptly dropping out of psychotherapy. On a psychodynamic "transference" level, the patient most likely felt he had symbolically been "abandoned" by his care-givers twice, first by Dr. Gay and then by Mr. Moss. These deviations and departures from the standard of care caused the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

It was a deviation and departure from the standard of care to fail to properly and effectively assess and treat the patient's chronic, severe insomnia. There is a high prevalence of clinical sleep disorders, the most frequent being Obstructive Sleep Apnea ("OSA"), in young veterans suffering from PTSD. There is a strong association and overlap between chronic insomnia and OSA. There is clear evidence that patients with OSA are at increased risk for co-morbid chronic insomnia. Veterans being treated for PTSD should be screened for OSA so that they may be diagnosed and treated for this condition. The first-

line approach to treating chronic severe insomnia, according to the PTSD Guideline, should be non-pharmacological treatments, including cognitive behavioral therapy and promoting good sleep hygiene. Long-term outcomes are better following non-pharmacological interventions. Sedative-hypnotic drugs are a second-line therapy for insomnia and *should be used only for a short period of time.* They pose foreseeable significant risks, ranging from dependence and addiction to dangerous psychological behaviors and death by accident or suicide, especially when combined with alcohol. In veterans with PTSD (a group with a very high incidence of co-morbid substance abuse), they pose an especially high risk. Notwithstanding the above, Mr. Legg's insomnia was persistently managed with a succession of these drugs (up through Dr. Duque prescribing Ambien), rather than more effective and safer approaches. No communication or coordination on this critically important issue took place among Mr. Moss, Ms. Joncas, or any of the treating psychiatrists. These deviations and departures from the standard of care caused his psychiatric condition to continue to progress unchecked and fail to achieve full remission.

In view of the above, it seems that the patient was becoming somewhat demoralized and even non-compliant with important aspects of treatment (*e.g.* dropping out of psychotherapy unilaterally), as well as continuing to self-medicate with heavy substance abuse. It was both foreseeable and predictable, under the totality of these circumstances, that the patient was heading toward a serious crisis that had been predetermined by multiple gross failures of a coordinated continuum of care at the Syracuse VAMC.

**Mr. Legg's Treatment at the Syracuse VAMC: Maintenance Phase: from December 28, 2011 to his Death on January 3, 2012**

On December 28, 2011, Mr. Legg presented as a walk-in. He had not been informed of Dr. Kaul's vacation and was seen by Dr. Duque, a psychiatrist who had never seen him before and was not familiar with his case. Dr. Duque said she reviewed his history in the chart, but never documents in her note that she was aware of and took into consideration

29

his aborted suicide attempt in December 2010. He informed her that he had discontinued Doxepin on his own two weeks previously because of intolerable side effects. This resulted in the return of severe insomnia and nightmares. He then restarted Prazosin on his own at a dose of 4 mg/nightly, which helped with the nightmares, but was not as helpful with the severe insomnia. He said the worsening insomnia had contributed to worsening anxiety and depression. To compensate for this, he had been smoking more marihuana.  He reported worsening PTSD symptoms, namely, severe insomnia, recurrence of nightmares, marked hypervigilance, hyperarousal, worsening anxiety, and associated panic. He also reported worsening MDD symptoms, namely, worsening depression, mildly worsening mood, severe insomnia, poor appetite, an unintentional 15 lb. weight loss in the past three weeks, poor concentration and focus, poor energy, and some growing anhedonia. A review of sleep medications he had been on in the past found that Ambien had worked very well, but he developed tolerance after six months; lorazepam was not helpful; Trazodone was helpful somewhat, but caused severe headaches; and quetiapine was too sedating, with daytime sluggishness. On mental status examination, he was anxious, restless, and jittery ("wired"). He denied suicidal ideation, intention, or plan. His insight and judgment appeared intact at this time. His diagnoses were PTSD, Chronic, Moderate in Intensity; MDD (rule out Bipolar Disorder Type II); Cannabis Dependence; and Alcohol Abuse in Full Sustained Remission. Dr. Duque's treatment plan was to re-try Ambien, 10 mg/ nightly, to which he had a good response in the past, before developing tolerance. It was hoped that he would have good response to it again and his current state of "relative decompensation" would return to baseline once his sleep issues were addressed. He was given a 30 day supply of Ambien. No changes in the doses of fluoxetine or Prazosin were made. The risks, benefits, and alternatives to treatment were reviewed with the patient and he expressed full understanding and agreement with the plan. The patient indicated he would call the clinic with any concerns and proceed to the E.R. should his condition worsen, or with any

development of suicidal ideation, intention, or plan. His next appointment was with Dr. Kaul on 1/4/12. On 1/3/12, after having ingested one or more Ambien pills and one or more drinks of alcohol, Mr. Legg lapsed into a coma and subsequently died. The cause of death was determined to be accidental, resulting from mixed drug toxicity.

**Clinical Comment # 4**

On 12/28/11, Mr. Legg presented as a walk-in and was evaluated and treated by Dr. Duque. He had expected to see Dr. Kaul, but had not been informed that Dr. Kaul was away on vacation. It was very likely demoralizing for him to have to see yet another psychiatrist for treatment and start over again. (He had already seen Dr. Gay, then, Dr. Kotz, then Dr. Kaul, and now Dr. Duque.) In addition to the problems inherent in these changes and disruptions in continuity of care at the VA, at the time it was very likely demoralizing for him to realize that after more than a year of psychiatric treatment, he was in essence "back at square one." He was now, after all this time, still suffering from distressing symptoms of both PTSD and MDD, with severe insomnia. Dr. Duque characterized his current state as one of "relative decompensation." ("Decompensation" is a term of art in psychiatry, which means deterioration of the mental health of the patient, a worsening of symptoms and a loss of function.)

It was a deviation and departure from the standard of care for Dr. Duque not to appreciate the serious gravity of his clinical presentation, which amounted to a crisis situation. He had an acute worsening of both his PTSD symptoms and MDD symptoms. It is questionable whether Dr. Duque had thoroughly reviewed his records, which were available right in front of her, and had learned of and taken into consideration his aborted suicide attempt in December 2010. She never documented in her note that he had made an aborted suicide attempt one year previously. Nor did she document in her note that he was more recently determined by Dr. Kotz to be "chronically suicidal." Nor did she document in her note that the recent PCL administered by Dr. Kotz had determined that he

31

had a high severity of PTSD symptoms (which indicated that his condition had been refractory to treatment measures). She should have learned about all of this background history (including also his history of untreated chronic substance dependence) and concluded that he was at a very high risk for suicidal behavior. Accordingly, she should have performed a formal suicide risk assessment, but did not. (It is nowhere documented in her note.) The mere fact that the patient denied any current suicidal ideation, intention, or plan should not have been taken at face value by itself. The totality of circumstances and the "big picture" had to be investigated further and given more weight. This would have included interviewing the family (who were readily available outside) to obtain information about their observations and concerns in regard to the patient's mental state, recent behavior, and psychosocial stressors. More aggressive treatment interventions, including hospitalization to provide a safe, secure, and protected environment might have been required and undertaken, if she had done an adequate evaluation. Dr. Duque was unfamiliar with the VA Guidelines for PTSD and MDD, which is reflected in her mismanagement of the patient's evaluation and treatment. These deviations and departures from the standard of care caused the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

It was a deviation and departure from the standard of care for Dr. Duque to prescribe Ambien to treat the patient's insomnia and to give him a prescription for 30 days' supply. Ambien is a powerful hypnotic drug that poses many dangers, including being synergistic with central nervous system depressants, such as alcohol. Ambien and alcohol have the same specific mechanism of action (involving the GABA-A receptor in the brain). Ambien and alcohol thereby potentiate each other, increasing and intensifying the dangerous effects each would produce by itself. The combination is extremely dangerous and should be avoided. The most dangerous result of combining Ambien and alcohol is respiratory depression resulting in death, which is what caused Mr. Legg's death.

32

Accordingly, it is recommended *never* to combine the two substances. The FDA warns against mixing the two at all, or even taking them hours apart (*i.e.* individuals who have had a drink during the day are warned not to take Ambien that night). Ambien can cause worsening of depression, abnormal thinking and behavior, confusion, impaired impulse control, and a range of bizarre behaviors (*e.g.* Ambien can induce an individual to walk out a window in his sleep). Moreover, the fact that the patient had developed tolerance to Ambien in the past and had lost that tolerance after not taking it for some time, meant that he was now even more susceptible to its dangerous side-effects at a lower dose. This was certainly not a safe medication to prescribe to Mr. Legg who was in a state of relative decompensation, with acute symptoms of both PTSD and MDD, "wired," and quite unable to exercise sound judgment. Mr. Legg had already demonstrated impaired judgment by changing his medications on his own (namely Doxepin and Prazosin), in a desperate attempt to self-medicate. Likewise, he had exercised impaired judgment by increasing his marihuana use to self-medicate. With his addictive tendencies, his increasingly heavy dependence on marihuana, and his past history of alcohol abuse, it was decidedly unsafe to say the least, to prescribe Ambien, with its potential life-threatening dangers and very narrow margin of safety when combined with very small amounts of alcohol. Under the circumstances, it was very foreseeable that a patient in Mr. Legg's state of relative decompensation and with his history was at very high risk to combine Ambien and alcohol, whether purposefully or by accident, with resulting dire consequences. It is not documented in the record that Dr. Duque specifically warned Mr. Legg of the potential lethal consequences of combining Ambien with even minimal amounts of alcohol. And under no conceivable circumstances was it warranted to prescribe a 30 days' supply of Ambien. If Ambien was prescribed at all (and it should not have been), the strict rule that would apply was to prescribe the lowest number of pills at any one time that is feasible. Dr. Duque had failed to observe the most fundamental principle in the practice of medicine, namely,

33

"*Primum non nocere.*" ("Above all, do no harm"). In view of his substantial suicide risk, prescribing Ambien in the first place and then compounding the mistake by giving him a 30 days' supply failed to meet the standard of care. These deviations and departures from the standard of care caused the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

It was a deviation and departure from the standard of care for Dr. Duque to fail to call in and interview the family (who were readily available outside), not only to obtain important background information about their recent observations of the patient, but also to include them in the treatment plan and safety plan (including the warning signs to look out for), and the need to closely monitor the patient. Considerations of confidentiality would not have been a bar to doing this under the circumstances, even in the unlikely event the patient objected. It was also a deviation and departure from the standard of care to fail to arrange for closer monitoring and follow-up of the patient, by arranging for him to be seen the next day and thereafter at frequent intervals, rather than wait an entire week (over a holiday weekend) for him to be seen by Dr. Kaul on 1/4/12. It would have been prudent to communicate with the MHTC to share the information about his current state of relative decompensation. (Although Dr. Duque was unaware that the MHTC was apparently no longer carrying out his duties; another breakdown of effective coordination at the VA.) These deviations and departures from the standard of care caused the patient's psychiatric condition to continue to progress unchecked and fail to achieve full remission.

The most extremely serious deviation and departure from the standard of care by Dr. Duque, which incorporates all of her above deviations and departures from the standard of care, was her prescribing Ambien for Mr. Legg, under the totality of circumstances and risk factors described above, which created a foreseeable and unacceptably high risk of his dying by ingesting a lethal combination of Ambien and alcohol, whether intentionally or by accident. Insomnia and anxiety were not the biggest risk factors, as she stated in her

deposition. Treatment of the patient's severe insomnia was clinically indicated. Severe

insomnia can worsen PTSD and MDD. Dr. Duque should have treated the patient's

insomnia, but it was a deviation and departure from the standard of care for her to treat it

with Ambien, for all the reasons specified above. (There were certainly a number of other

effective, well- tolerated, and safe hypnotic medications available with which to treat him.)

But for the presence of Ambien, the death of Mr. Legg would not have occurred in the way

it did. These deviations and departures from the standard of care were directly and causally

related to Mr. Legg's death.

In summary, the multitudinous deviations and departures from the standard of care

specified in detail above caused Mr. Legg's psychiatric condition to continue to progress

unchecked and fail to achieve full remission, ultimately being a substantial cause of his

tragic death. In large measure, as outlined above, these deviations and departures from the

standard of care reflected an overall administrative/clinical failure to provide coordinated,

integrated, properly monitored, and efficacious psychiatric care and a failure to apply the

VA's own Guidelines and protocols.

**Appendix B contains the following: a list of all other cases in which, during the previous 4 years I have testified as an expert at trial or by deposition; a fee schedule of the compensation to be paid to me for my expert services in this case; and my current Curriculum Vitae which sets forth my qualifications and lists all publications authored in the previous 10 years.**

Very truly yours,

Robert Lloyd Goldstein

RLG:in

ROBERT LLOYD GOLDSTEIN, M.D.
Clinical Professor of Psychiatry
College of Physicians and Surgeons
COLUMBIA UNIVERSITY

35